We're here for argument this morning in the case of Gautt v. Lewis, and we have allocated 20 minutes per side. I think you received that notice. There are two issues, and you may begin. I beseech the Court. My name is Wayne Young, and I represent the habeas petitioner, Gautt, in this case. The Court will now have two certified issues. The first is that constructive amendment issue. The second is the Batson issue. On the constructive amendment issue, it's clear, I think, that it was a constructive amendment and not a variance. It was a change in the terms of the charge with which my client was charged. It went from being a mere personal use to being personal and intentional discharge. It's the intentional that distinguishes it. Were you the trial lawyer? I was not, Your Honor. So the dividing line between constructive amendment and variance is sometimes difficult to draw, but it seems to be whether it's a change in the elements of the crime as opposed to facts that are proven at trial. And this is a change in the elements of the crime, of the enhancement, the 12022-53 enhancement, from being, as I said, from mere use to intentional discharge. Do you think it's – that's part of the problem. There's also some suggestion, I think, in your briefs that the jury didn't really exactly find the elements of the D crime either because the special verdict form didn't have the intent language in it either. Nor did the prosecutor, when he was arguing about it, use the intent language. So it's not only that it wasn't charged, but it may not have been found. Is that right? That's exactly right, Your Honor. The only time that the words intentional were used, including in the colloquy on the jury hearings, was in the actual instruction when the court said that the jury can convict if they found that he personally and intentionally discharged the firearm. The verdict form only had personally discharged. It did not mention intentional. And in all the discussions, and there were lengthy discussions leading about the jury instructions, everyone assumed that it was going to be the personal use charge. So wouldn't – I mean, once you get into variance and notice, you're in a murkier area, it seems to me. Wouldn't the cleanest way to analyze this just be under Apprendi and whether or not the subsection D was actually proven? It is, Your Honor. And at some point, constructive amendment, and I think I pointed this out in the brief, an Apprendi merge or the Apprendi line of cases, as pointed out, I believe it's in the of cases has made more – has broadened the concept of constructive amendment. And I think that's continued. It wasn't noticed. You know, fundamental right to notice of the charges, and he was never given that notice and didn't really know about it until the court instructed the jury. So whether it's failure to prove under Apprendi or under the constructive amendment, it was fundamentally unfair. What would be the consequence if you were correct on Apprendi? Isn't it essentially if you could equate personal use and personal discharge and say that they did prove what was originally alleged, and that is the personal use, and then you would just go back to the 10 years rather than having a new trial on this? Well, our argument is both the personal use and the intentional use convictions should be wiped out in this case. Why would that be? I mean, we have a special verdict at 4. I mean, the special verdict does find the elements of the personal use. I mean, the elements that it finds would satisfy the personal use. And it cites to the personal use B, and, in fact, the jury, the judge entered a judgment under B which was only revised by the appellate courts. So why don't we just go back to the original B and just say the mistake was to say 25 years. It should have been 10 years. That's the more difficult question presented by this case. The intentional use, I think, clearly fails. But it's really analogous to a situation in which the government, for its own reasons, chooses to go for a higher degree of a crime. Well, the government didn't really do it either. The government, in its closing argument, said repeatedly, I'm not asking you to find that you intended to do it. And when it – and when the government quoted the language about personal use, it referred to personal discharge. But, again, it didn't say intent. So it never told the jury to find intent. And the special verdict form didn't tell the jury to find intent, but the elements do meet what was charged, don't they? Well, Your Honor, you're right that the government never did argue it. So perhaps my analogy is flawed. It was the court that instructed in that sense. Right. Nevertheless, the jury was never specifically presented with the issue of personal use. Did the jury find personal discharge under the special verdict form? It did. Okay. And if, as a matter of law, why isn't personal – why isn't personal use encompassed within personal discharge? I guess the argument, Your Honor, and, again, this is a more difficult argument than the intentional discharge is, that the instructions were just so fundamentally flawed that neither can stand, either the personal use. It's just so confusing. The entire colloquy about the case is we're going to go for the personal use and then their intentional discharge. We don't know what the jury found just because – We know exactly what the jury – see, that's what's unusual here. I mean, because of the special verdict form, we know exactly what the jury found, which is that there was personal discharge in the commission of the crime of murder that approximately caused the death within the meaning of subsection B, which is the dissection. So why don't we know that that's what they found? Only because what they were instructed about was to find personal intentional discharge. So, again, it comes back to the instructions and the colloquy just being so – But usually, you know, I hear your argument, and I think that it probably has more force in those cases where we don't have a special verdict form, because then we're supposed to try to think what they were thinking. Here we don't even have to ask what they were thinking. So we – even if there had been – even if there's an error in the instruction, but what they found is specific enough to meet it, I'm wondering why this isn't distinguishable from those cases where things are mixed up solely because of the jury instructions. That's a good analogy, Your Honor. The special verdict certainly lends credence to the finding, to a decision that the jury did find it. And I'll just rely on the fact that there was so much confusion between the information, the instruction, the verdict, that the entire verdict on the discharge has to be eliminated. Maybe you want to move on to Batson? I will, Your Honor. I think Batson and Johnson combined have made clear that the original showing is fairly minimal. And Johnson also made clear that there is a substantive difference between the Wheeler test and the Batson test, and the Batson test is much more demanding of the government. But to demonstrate that three of the eight, nine, if you use counsel's arguments, peremptories were used to eliminate black jurors from this case is enough to meet the first step of the Batson test. Just that, with that regard to how many people either came to the podium to be voir dired or were in the overall veneer panel. Now, we don't know anything about the overall veneer panel. Does that matter? It certainly would have been better to have a – to know more about it, but my position is that the three out of nine is sufficient to raise that original inference under Batson that puts you to the second step. And again, Johnson emphasized how important originally that the Court intends trial courts to abide by the Batson. And the – Kagan. But wait a minute. The same position if it were two out of nine? It would be a lesser argument. You know, re- Let me ask you about that, because unfortunately, the prosecutor said, you know, for the record, I think, she said that they would put on the record the reason for one of the jurors, but it didn't happen for the rest of them. So we're left with the judge rather than the prosecutor making an argument, if you will. But there was a reason given for one of the jurors. And my question is, if that is sufficient to shift the burden back under Batson, why aren't there only two jurors in question? After the second preemptive was used, excuse me, African American, the court didn't even request a response from the prosecutor, but the prosecutor put it on the record anyway. Right. So there it is. And now a third black juror is stricken. To give the total of three out of eight or three out of nine, you know, my argument is under Batson and Johnson and the en banc case of this Court, Kessler. That's sufficient. You're not answering my question, though. Maybe – and let me be more precise. My question is why, once the prosecutor put on the reason for one of those jurors, why that juror would then be included in a prima facie case? Because the prosecutor gave a race-neutral reason under Batson which would then shift it back to the defendant. So why isn't it two rather than three jurors that is the numerator in the equation? I think what the Court is suggesting, having put the reasons on after the second one, they start, if not with a blank slate, but the third one becomes, is one more striking of a black sufficient to raise that initial inference under Batson. I think you have to look at the totality of the circumstances. And, you know, the two were excused, and the third, again, is sufficient to trigger the second step. We must be crossing in the night, okay, because you're not getting my question. My question is, you keep saying there's two and then there's three, but the second juror, there was a reason given, and was that sufficient under Batson to essentially kick that juror out of the mathematical statistical formula, however we may view it? Well, I don't think that reason was sufficient, Your Honor. Now we're getting there. And here's why. The reason given by the prosecutor and the reason given by the judge after the third strike were all these jurors had traumatic experiences or difficult experiences in some way with the criminal justice system. They had family who were crime victims or family who were defendants in case. But if you look at the entire voir dire, the entire jury pool, the veneer here, they were all, to a remarkable extent, had had the same kinds of experiences. Not just those three. If only those three or two had had those difficult experiences with the criminal justice system, that perhaps would excuse the peremptory challenges. But you're now engaging on the merits of the adequacy of the reason. And I think Judge McKeon's question was let's assume for a moment the adequacy of the reason. Let's assume that this was a – this reason would pass muster. Does that juror then drop out of the – out of the statistical showing for purposes of determining whether overall there was a preemptation case? I don't believe so. I think that second juror has to at least inform the discussion about whether the peremptory challenge on the third juror was for possibly race-related reasons or not. It's part of the equation. Okay? The second juror? There might be a good reason, but the fact that there were more of them itself gives – there's sort of a synergy between the numbers and the reasons. Precisely. All right. Let me ask you a different question. You – you're just taking three out of nine, and you're not looking – but we do have more information than that. And the government sort of puts it together in its brief and says, I forget the exact numbers, but we do know how many people were voir dired, and we know that of the ones that were voir dired, something like eight were – were preemptorily dismissed by the defense. We don't know anything about their racial composition. Maybe we can guess, but we don't know. And we know that four or five were dismissed for cause. And then we know of the remaining ones, we know how many were African American and how many were left on the jury. And there's a slight – some – depending how you take those numbers, there's some percentage disparity in the percentage that were struck and the percentage that were in that – that pool, the pool of people that were voir dired, not struck for cause, and not preemptorily challenged by the defense. So is that number good enough, or do we have to know the larger number, i.e., what – who were the people who were struck for cause or preemptorily challenged by the defense? I mean, this is all leading to, should there be an evidentiary hearing on that issue? Heck. Well, there should. Just on that issue, just on the prima facie case issue, because three out of nine is not a very meaningful number. It depends, you know, what the baseline is. We know more about the baseline than you started with, but we don't know all about it. Well, we do know more. We know that they did end up with two black jurors on the panel, and we know that I think there was 30 or 40 in the total veneer. Well, what do you mean by the total veneer? This is an interesting question, because the total veneer appears to be meaning the people who were sitting in the courtroom and were never called for voir dire or were a word called for voir dire seems to have been 64 or 65, according to the defendant, but not in evidence. But he says then it's probably right, or at least it's going to be more than the ones who were actually called up. Then the number called up was somewhere in the 30s, in other words, voir dire, and the number who were not struck for cause or by the defense is a smaller number. So there are at least three possible baseline numbers. Which one do we use? Well, the one I've been using is the ones who were questioned. The total number of jurors who sat in the box and were excused. And I think that's the number that comes out to about that. We know nothing about the other people that were called to the jury room. But just sat there. But just sat there, because we don't have the juror questionnaires. So what would the – that's really the question I have, you know, eight years after the fact, I think we are, is what would this mean as a practical matter? And we'll also ask the State the same thing. I mean, it doesn't seem to me to be the kind of evidence we'd rely on for statistical to have your client say, well, I think there were four blacks. It turns out he's actually wrong in terms of the evidence and I think in terms of what he even said in his brief. So what would be the evidence and where would it come from? Well, my argument is that the conviction should be reversed. I understand. But if there were an evidentiary hearing? Well, the prosecutor would be called, as I understand several of the cases that have been remanded from this case, the prosecutor is called at the evidentiary hearing to explain why she made the choices she did. Well, wait a minute. That's a different question. It's a different question. That's a separate whether she can now come up, you know, with a race-neutral, consistent with what the judge said on the record at the time. To fill in what Judge Berzon is talking about, to get a picture on which you base a statistical analysis, this case is somewhat like some of the Ninth Circuit cases where we said, well, there's just not enough there. We can't make that determination. Is there anything in available records that would reconstruct the pool as a whole and any other numerical aspects of the case? Well, in addition to the prosecutor, perhaps the jury questionnaires are available. Perhaps from the court. You know, if the conviction isn't reversed and it's remanded purely for an evidentiary hearing. Just a minute. I don't see any way we could reverse the conviction rather than having an evidentiary hearing, at least on the question of the prosecutor's reasons, because the prosecutor never gave his reasons except as to one of the jurors. So we would at least have to do that, wouldn't we? Well, my argument is that it's structural error because it affects the entire framework in which this case occurs. Well, what is structural error? The only thing that you have is you might have a prima facie case, maybe, but you certainly don't have at bats and nobody ever went to the next stage because the prosecutor was never asked for his reasons. And that's exactly the problem. If we do have the prima facie case. You don't win. You just get to ask the prosecutor for his reasons. And since that hasn't happened yet, there at least would have to be an evidentiary hearing for that purpose, wouldn't there? I think this Court could find that the failure of the Court to do the second step and, as a result, the third step wasn't done, was so fundamentally flawed that it's structural error. It wasn't a fair trial. Is there any case to support that? There is not. Okay. Why don't you save the remaining time for rebuttal? I will. Thank you, Your Honor. Do you mind starting backwards since we're on Batson now? I'd be happy to. I think we're going back to the question of the question of the remand case.  We're getting to that point where it seemed to be the question. You know, he said, the same question I want to ask you is, you know, what would a remand look like? I think in your brief you said, well, in any event, even if you thought there was a prima facie case, you shouldn't grant the petition, you should have a hearing. Of course not, Your Honor. And what would that hearing look like? Johnson changed the scope of Wheeler and Batson in California. We now know that Batson is this reasonable inference standard. But as Judge Burson points out, all that gets you is a de novo review of whether the petitioner at trial made a prima facie case of discrimination. I don't think that is supported on this record, but to answer your question, hypothetically, if this Court finds that it's the case, well, then the burden shifts to the prosecution to be able to provide race-neutral reasons. And then the burden shifts back to Petitioner, as the ultimate burden always rests with Petitioner, to show a pattern of racial discrimination and bias. Are there any other available documents that would change the statistical analysis? In other words, he talks about the jury questionnaires, but I don't believe they would be asking race on jury questionnaire. So, I mean the question is, would we simply be left with the prosecutor providing a race-neutral reason? I think that would be very likely the outcome. And this is sort of an unusual case, because the trial court didn't just say no prima facie case, let's move on. There's that one juror that the prosecutor did offer some reasons. We don't know if that's all of her reasons. But we have a record here where the trial judge made findings. But there are other cases like that, and we've been very emphatic about the fact that that's totally irrelevant stuff, because the question isn't what the trial court thought about it or whether there were reasons. The question is what were the prosecutor's reasons. And Johnson's clear about that, and our case law is clear about that. But we don't get to the prosecutor's reasons unless there's a prima facie case found. Right. And Johnson doesn't automatically mean that Petitioner at trial made a prima facie case. I understand that. But why would the fact that the judge made some observations when they were his observations relevant to anything? Well, they're relevant because if they accurately reflect the record before this Court, just because there's no presumption that they're correct, there's also no presumption that they're incorrect, the scales are even.  But they may have nothing to do with what the prosecutor was actually doing. The prosecutor may have actually been just striking black jurors because there were black jurors. But if there's no prima facie case based on the record, then the burden doesn't shift to the prosecutor. Well, that's true, but that's a different problem. But we can't take the judge's reasons. Well, I don't think we get to that point, because Petitioner here has offered nothing other than a statistical assertion of either 3 out of 9 or, as Judge McEwen points out, maybe it's accurately more described as 2 out of 9. And while his argument is that it's good enough. Yeah, but that's not quite right, because as you say in your briefs, we know a little more than that. So what we know, as I understand it, is that 37.5 percent, if we took it that way, or 33 percent of the strikes were for African-Americans, and that the jury pool, if you take it to be the pool we know about, which is the people who were voir dire, not stricken for cause and not stricken by the defense, was somewhat lower percentage of African-Americans, you know, in the 20s someplace. So there is some disparity. We know that much. We don't know about the people who were stricken by cause or for cause or stricken by the defense. We can kind of guess. I mean, I think there's a very strong inference that they were an African-American, because if they were, somebody probably would have said so. But we don't know it. So the question is, can we make that inference, or do we have an evidential hearing on that question? I said, if it turned out that all of those people were not African-American, which I'd say is probably the case, just as a guess, then you'd have a real disparity, I think, because you'd have something like 37.5 percent or 33 percent stricken and, you know, somewhere under 10 percent of that pool African-American. The Court specifically stated in Williams those sorts of statistical assertions without more are insufficient. Because Williams failed to allege, this Court stated. Which Williams case are you talking about? This is Williams v. Woodford at 384. Right. But that was before Johnson, wasn't it? But this Court has always felt that Batson has meant the same thing as Johnson. Yes, but we have, in fact, since then, taken totally percent. We have taken just percentages and said that was a prima facie case. And Fernandez and others, haven't we? But have we taken any percentage that is as low as this? Not that I'm aware of, Your Honor. Well, that raises another question here. Let me ask you about this, because nobody's mentioned AEDPA here. And I have a question about that, because obviously the State court was wrong, as we now know in Johnson, in terms of its standard under Batson. Yes, Your Honor. Do we – are we in a situation where we give no deference to the State court because it was overtaken by events in the Supreme Court, and it doesn't then have any findings that are relevant for us to look at? Well, I think that the State findings have tremendous relevance and value, but they're not presumed correct, and you don't apply AEDPA deference. You review them de novo. But that doesn't mean he succeeded in making his prima facie case, let alone that he's entitled to habeas relief. It just takes it out of 2254's heavy deferential analysis. Now, we have – I hate to say this, because I would not like to sit on this case any longer, but we have an en banc case pending on these very nice AEDPA – nice meaning fine AEDPA questions, as – which rise directly out of the set of cases to some degree, as to whether if the State court was applying the wrong standard, does that mean we simply grant the habeas, or what do we do next? Do you know about that case, France? It's a fascinating issue. We have a contrary clause, contrary to clause, and are we looking at just the reasoning, or are we looking at the result? The result or the reasoning. The result or the reasoning. Isn't this exactly that in that line of cases, unfortunately? Arguably, it is. I think that obviously we can't look at the reasoning, because California operated under Wheeler, which has been invalidated by Batson. But we have some case law that suggests at that point you grant the habeas petition. I mean, it seems a little strange, but we do have some case law saying that. And that's what France is supposed to be resolving, right? Well, I'm not aware of any case that says the right result in State court gets automatic habeas relief just because they arrived at it at the wrong time. I thought that was the conflict that gave rise to France. That is part of what gave rise to this France case. It may be we'll have to look at it, but what we may need to hold in this case. I get what you're saying, though, is let's say that hypothetically the France court says, well, you're not really stuck with the State court reasoning, but you are, of course, stuck with their result. Let's just say they say that. As in a silent denial, an adjudication on the merits. Right. A silent denial. But then are there any factual findings here to which we should at least consider, even if we don't give them heightened deference? Is there anything in the record from the California Court of Appeals that you think relates to a finding on whether there's a prima facie case? Well, obviously there's been findings by the trial court, the California Court of Appeal, and then echoed again in the district court, that there were compelling race-neutral reasons. Now, whether this Court looks at those findings deferentially or under de novo, the record that led to those findings is still there for this Court's review. Because that's – and I'm a little confused about that, to tell you the truth, because the compelling reasons were the ones given by the judge. And those – if those had come out of the prosecutor's mouth, we probably wouldn't be here, I guess. And then under Johnson, they say, well, we shouldn't be looking to the judge. We should look to the prosecutor. So even though the State court found these compelling reasons, I don't know what to do with those. Well, you remove the presumption of correctness from the trial court's findings. But it doesn't mean that you have to ignore those findings. They're just – But what is the relevance of those findings when they deal with the fact that there were good reasons, but they weren't necessarily the reasons? They're relevant to this Court to decide whether, under the totality of circumstances before this Court, the defendant met his burden to make a prima facie case of racially biased parenteral challenges. So you would essentially say that the numbers being not the strongest and there being on their record a suggestion of race-neutral reasons to balance out the weakness of the numbers, that's the totality of the circumstances? Yes. Especially in this case where I would submit that these are not a close call in terms of the compelling race-neutral reasons. These were jurors that had traumatic experiences. It depends on the – but doesn't it depend on the comparative issue in our – which our Boyd case recently put a lot of stress on? I mean, I have not looked at – I'm sorry? I'm sorry. That wasn't what I was suggesting, to do a comparative juror analysis. I'm looking at the actual jurors that gave the lies. Well, why wouldn't we do a comparative analysis? If they were not dismissing white jurors with the same kinds of reasons, then what's the relevance of it? Well, maybe I'm confused, but I see that the facts that are there in the voir dire about the struck jurors, prospective jurors, were highly compelling facts that any prosecutor would be well within her discretion to exercise her jurisdiction. Well, that may be, but not if your opponent says, and I don't know because I haven't looked at it, that if you look at the voir dire pool as a whole, you'll see that they all had lots of criminal relatives. And some of the other prospective jurors that were struck had negative experiences in the voir dire. What about the ones who didn't? What about the ones who weren't struck? Well, we don't know about that, because all we have are these bare statistical assertions. Well, wait a minute. We have to know about the ones who weren't struck. They must have answered questions on the record. What does the record show about the white jurors who were not struck? I'm not – I don't have that information at my fingertips, because it wasn't at the jury. It's critical information. I mean, the reasons that you might have struck the black jurors are not pertinent if you weren't striking the white jurors for the same reasons. Well, I do know that there were other jurors that were struck for similar reasons, and I don't know the race of those jurors. Okay. I'm assuming that the only African-American jurors who were struck for these reasons are – these are the jurors that gave rise to this claim. I think maybe you should go to the other issue. I think so. Thank you. If I could start that issue by addressing the questions you started with Judge Berzlin. You had concerns about the verdict form and the prosecutor's arguments and sort of contended that they didn't address this element of intentional disregard. The prosecutor is standing there saying we are not asking you to find intent. Well, let me – He goes over and over that. And then he comes to the point where he talks about this personal discharge thing and he quotes the requirements and it doesn't have intent in it. And he never asked them to find intent. If I could – I disagree. Those are excerpts from Appellant's brief. If I could also excerpt from the prosecutor's closing argument, the – No. I was reading the prosecutor's closing argument, not the brief. The prosecutor's closing argument specifically argued that he fired it. This is a murder because he shot her and killed her. He was standing over her with a loaded handgun at her. He pulled the trigger. The gun didn't just go off. It wasn't an accident. He knew what he was doing and he meant to do it. She sat in a chair whimpering and the defendant put a loaded handgun in her chest and shot her. And then says I submit to you that he meant to, but that's not the issue in this case because I'm not asking you to find he intended to do it. And so – and then he goes on and says, I submit to you that he had to cockpick on that's deliberate behavior, conscious disregard, applied malice before I thought. He pointed at where he would kill her, et cetera. So he said, well, you might be able to find this, but I'm not asking you to find that. And then he goes on and says, with regard to this particular issue, that the – let's see. Next, it – let's see. No one is – next one is called personal discharge of a firearm. It's similar but not exactly the same. You need to find that he personally discharged the firearm, that it wasn't a commission of a murder. That means that he's the one that had his finger on the trigger. And he's admitted that. Next, it proximately caused the death of a human being. That means because he had his finger on the trigger and because the murder happened, that's what caused the murder or the death. That's it. Nothing about he intended to pull the trigger. He was standing over her, pointed a loaded handgunner, and he pulled the trigger. At Supplemental Excerpts of Record, page 229. And if I also may point out, and this is a critical point that I want to make because this Court has focused on the absence of the word intentional in the verdict form, but the jury instructions are clear. They say that the term personally discharged a firearm as used in this instruction means the defendant must have personally and intentionally fired it. They returned the special verdict form on the personal discharge of that weapon. It is presumed that the jury followed the instructions and there has never been an assertion to the contrary. So back up now to the amendment issue or whatever, the due process issue. The information charged B in the language of B, right? The information charged that he murdered Samantha Fields on X date and that he used a firearm in the commission or attempted commission. Personal use, cited B. Right. Nothing about personal discharge, nothing about intent, nothing about just that. Personal use of a firearm in the commission of a crime. The California Court of Appeals, as I recall, said that somehow that encompassed D. I don't understand that. Because the notice requirement is that the charging document or the preliminary hearing or whatever notice is given to the defendant alleges the facts that he is needed being accused of and called to defend against. And the California Supreme Court made not only a factual finding, which is binding under 2254e, that this was a mere numbering error. It wasn't some kind of bait and switch. It wasn't, because the language was the language of B. And they, well, but there has never been a situation under California law that an incorrect citation to a penal code subject to the law. But it isn't an incorrect citation, because the language was the language of B. In other words, if you cited the language of B and had to cite it to B, that would be one thing that isn't what happened here. So what we don't have here is it didn't say he personally discharged and then cited B. Instead, it cited the language of B, which is personal use. So that, to me, is different than these other cases. I mean, why? That's what I find kind of troubling, because you go through the whole case and it's personal use, not the personal discharge, which would encompass the intent element. There's no dispute that the State court found there was a numbering error and that this language from subdivision B was used at various points in the trial. Okay. So why isn't it at least true that the court of appeals finding that this was a numbering error is unreasonable? I disagree. Right from the preliminary hearing, there's never been any dispute or any misconception that the defendant here was on trial for murdering Samantha Fields and that he shot her at point-blank range with his handgun. But it was a second-degree murder trial, and the jury was told that they didn't have to find intent in those words. They were also told that if they found him guilty of murder, they needed to then decide whether he personally discharged. And they weren't told that that included intent. They weren't told that. Well, by the jury instruction, but never by either the indictment, I mean, the information, or by the prosecutor. But they wouldn't have been able to find that personal discharge unless they followed this instruction. These were not these they said that the defendant must have personally and intentionally fired. Does the instruction reflect the information? You're arguing that it does. That part I don't understand. That's not the issue. The issue is whether the defendant had proper notice of the crimes charged against him. The State court made a finding that he did. The United States district court found that was not unreasonable. Yes, but I think so in part on the ground that the information gave him that notice, and that seems to me to be clearly wrong. So then the question is whether there's something else that gave him the notice. Well, I think we've outlined what I believe to be very compelling reasons right from the preliminary hearing all the way through the evidence in chief, where you have a ballistics expert introducing evidence from the prosecution that this was not a hair-trigger weapon, this had to be pulled deliberately, right through to closing argument, which I've added my own excerpts in today to try and give what I think is a more accurate perception of how the prosecutor characterized this evidence, right through to the verdict form, the instructions, the sentencing. At no time did the defendant say, oh, hey, wait a second, I'm being blindsided here. Everyone knew what he was being charged with. He defended that charge. As the district court said, it's impossible in this situation to imagine that the defendant would have – that either side would have tried this case any differently had the subdivision D been included in the information rather than subdivision B. And the overarching principle here is that no U.S. Supreme Court compelled the California Court of Appeal to rule otherwise in this case. I would submit that ends the inquiry. And unless there are further questions on it, I would submit on the briefs. Thank you. Thank you, Your Honors. I think you're about out of time, but we'll give you a minute for rebuttal. I'll submit. All right. Thank you both, counsel, for arguing. It was very helpful. It's not an easy case. We appreciate your argument and your briefing as well. We're adjourned for the morning.
judges: McKeown, Berzon, King